Filed 4/27/23  J.H. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| J.H., | |
| Petitioner, | E080822 |
| v. | (Super.Ct.No. SWJ2100304) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Michael J. Rushton,

Judge.  Petition denied.

Daniel L. Vinson for Petitioner.

No appearance for Respondent.

1

Minh C. Tran, County Counsel, and Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsel, for Real Party in Interest.

The juvenile court terminated family reunification services for petitioner J.H. (mother) and set a Welfare and Institutions Code section 366.26 hearing.[1] She seeks an extraordinary writ, arguing there was insufficient evidence to support the court's conclusion that real party in interest Riverside County Department of Public Social Services (department) provided reasonable services and there was no substantial probability of return. We deny the petition.

BACKGROUND

Some years before this dependency, mother suffered a brain injury which she attributes to an assault by G.B.'s father. Possibly because of this, mother is cognitively impaired, has severe mental health problems, and struggles keeping her anger and frustration under control, especially concerning her son G.B. (born 2013). These issues resulted in this dependency action, after mother physically abused G.B. In her writ petition, she argues that the services the department provided during the dependency were inadequate to address her issues, and that there was a substantial probability that G.B. could be returned to her if the department continued providing services.

The dependency began after mother hit G.B. and pulled his ear during a distance learning class. The department found that G.B. seemed "dirty as if he had not taken a

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

shower i[n] a couple of days." He appeared below his developmental age range, possibly with a speech impediment.

Mother "appeared to be challenged cognitively," and presented as "either having a mental health issue or a cognitive issue." Her doctor disclosed that she had (among other ailments) anxiety and dementia (unspecified type with no behavioral disturbances). She said she was not taking any medication and was not in therapy.

Mother denied any history of substance abuse, but a urine test was positive for methamphetamine, as was one a month later. Mother claimed the positive tests were caused by prescription medication, but her doctor said that none of her prescription medications were "mind altering" and none would produce a false positive for methamphetamine.

In June 2021 the department filed a section 300 petition alleging, among other things, that mother suffered from mental health issues and substance abuse, that she hit G.B., and that she neglected G.B.'s educational and developmental needs. At the August 2021 contested jurisdictional and dispositional hearing, the court found the allegations against mother true. It ordered family maintenance services and a psychological evaluation for mother.

Between August 2021 and December 2021, mother enrolled in counseling services and anger management, but not parenting education or substance abuse classes. Mother also submitted to a psychological evaluation in November 2021. The evaluating psychologist, Dr. Garett, found mother "showed a great deal of intellectual

impairment . . . probably due to a neurocognitive disorder due to brain injury." He also found that "her prospect to benefit from psychotherapy is not great," and that she "wa[]vers unpredictably in her behaviors . . . and . . . has difficulties controlling her behavior and temper when talking to her child." Mother told him that she stopped taking all medications because her drug tests were positive.

Dr. Garett expressed concern "about [mother's] ability to show self-control in coping with her son." Because of this, he recommended "the Wraparound program or some behavioral therapist should make a home visit and determine whether, in fact, she is handling this child in any way which meets an acceptable way of parenting." He also expressed concern mother was not taking her medications, which included medications for depression and for her heart. He agreed these medications should not have caused false positives in any drug tests, and recommended mother "be sent back to a psychiatrist and put back on medications, possibly medications for bipolar or psychotic components." Finally, he recommended mother receive some form of behavioral management and that a public health nurse visit her regularly "to see if, in fact, the environment there is acceptable or manageable."

In December 2021 a neighbor saw G.B. with a black eye after he was sent home from school early. The department confirmed G.B. had a black eye as well as multiple other minor injuries such as cuts, bruises, and at least one mark on his leg which appeared to be a human bite mark. At least six adults told the social worker G.B. did not have the black eye when he left school. G.B. was dirty, and mother's home was cluttered and

4

dirty. Mother was agitated, called the social worker names including a racial slur, had difficulty following questions, appeared to be under the influence, and refused a drug test. Mother took G.B. to the hospital at the social worker's urging. Mother became belligerent with hospital staff and had to be escorted off premises. G.B. eventually admitted mother hit him in the eye, bit him on his leg, pinched his ears, and hit him on the head and leg. Mother was arrested and charged with intentional infliction of unjustifiable physical pain on a child (Pen. Code, § 273a, subd. (b)).

The department filed a section 387 supplemental petition alleging "mother continues to have unresolved mental health issues, refuses to drug test, and continues to utilize inappropriate physical discipline." The court detained G.B. from mother on December 22, 2021.

In February 2022 mother had a second psychological evaluation, this time with Dr. Hicks-Benam. The doctor found mother continued to be cognitively impaired. She was irritable, hostile, minimally engaged throughout the assessment, and had "an inability to acknowledge her actions and need for care." She also "did not appear to understand her role or responsibilities regarding keeping [G.B.] safe," lacked insight, and minimized her behavior, which "increase[d] risk for continued problematic behavior[ ]." The doctor recommended substance abuse treatment, counseling, a medication consultation, and parenting classes, as well as that all visits be supervised.

The department referred mother to additional services, including a medication evaluation and anger management. The department also referred her to Linkages, a

5

housing and public aid resource, and a parent partner. Her original referrals for substance abuse treatment, parenting classes, and individual counseling remained in effect.

As of March 2022, mother had participated in 12 counseling sessions and was participating in anger management and other individual counseling. She did not, however, submit to required drug testing.

That same month the court sustained an amended section 387 petition, removed G.B. from mother's care, and ordered reunification services. In addition to substance abuse treatment, parenting education, and individual counseling, the court also ordered mother to refrain from all corporal punishment and participate in a child batterer's program.

Between March and August 2022, mother continued with individual counseling, began the child batterer's program, and tested negative for all drugs on three different on-demand drug tests. Nevertheless, the department expressed concern that "[h]er inability to multi-task and her level of frustration and unresolved mental and medical health issues[ ] continue to pose a risk for [G.B.]" The department reported that mother "will need ongoing and possible long-term support to parent[ ] her son." In general, the department noted mother "continues to struggle with meeting her own needs," would need help getting G.B. to and from school on time, did not understand he was developmentally behind, could not help him academically, and was hostile to the idea of giving him medication to treat his newly diagnosed ADHD. The department recommended further reunification services.

In October 2022 the court held a six-month status review and continued reunification services.

As of January 2023, mother had completed 24 sessions of her child batterer's class, completed individual counseling, and had complied with drug testing. However, the department still found the prognosis of return poor. In particular, the department was concerned that mother exhibited inappropriate behavior during visits and towards the caregivers. The department tried to transition to unsupervised visits, but G.B. reported that mother stabbed him in the hand with a screwdriver during one of these visits and showed the social worker a small bruise. After this, visits became supervised again. In addition, the department had to move the location of the supervised visits from a public restaurant to department offices because the caregiver did not "feel safe supervising visits with the mother in public due to her behaviors."

Moreover, though mother did participate in services, her mental and cognitive issues continued to prevent her from caring for herself or her son appropriately. Her home was never clean despite multiple attempts at explaining she needed to keep it clean and safe. She was usually disheveled, and her hands, nails, and feet were usually black and dirty. Despite the services she had received, she continued "to be easily angered and frustrated, and could not demonstrate new skills." In sum, the department was not optimistic that G.B. could ever be returned to mother's care and noted "there is no mechanism within our social system to continue providing supervision of [G.B.] in his mother's care . . . . The Department cannot continue monitoring [mother] in the hope that

7

her intellectual, cognitive, and reasoning abilities will remarkably improve." Accordingly, it recommended terminating reunification services and setting a hearing under section 366.26.

The court held a contested 12-month review hearing in March 2023. Mother argued she had participated in her case plan services, but that the services provided were not reasonable because she should have been provided a public health nurse at visits and at home. The court rejected mother's argument that she was due additional at home services because "these are services which are applicable once a person rises to the level . . . where they can have unsupervised visits," and mother was trending in the opposite direction. The court concluded that though mother had participated in services, she had not benefited from them. Accordingly, it terminated reunification services and set a hearing under section 366.26.

## DISCUSSION

Mother argues the department did not provide reasonable reunification services and that there was a substantial probability of return. We disagree and deny the petition.

A. *Reasonable Reunification Services*

Mother argues the department failed to provide services as recommended by Dr. Garett. These services, according to mother, included wraparound services, behavioral therapy in mother's home, services through the Inland Regional Service, a medication evaluation, and a public health nurse to visit and assist her in the home. The People argue that Dr. Garett did not recommend all of these services, and that in any case

8

the services he recommended were applicable only while G.B. remained in mother's home, so were not relevant once G.B. was removed.

When a court orders reunification services, the department must ensure the services provided are reasonable. (§ 361.5, subd. (a); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.) Whether the reunification services offered were reasonable and suitable is judged according to the circumstances. (*Earl L. v. Superior Court*, at p. 1501.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) Any reunification plan "must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding." (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.)

The court's reasonable services finding "must be made by clear and convincing evidence." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) We review the finding that reasonable services had been provided or offered for substantial evidence. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) In other words, "the question before a court reviewing

9

a finding that a fact has been proved by clear and convincing evidence is not whether the appellate court itself regards the evidence as clear and convincing; it is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof." (*Id.* at p. 1009.)

Here, there was substantial evidence mother received reasonable services. As the juvenile court pointed out, the at-home services Dr. Garett recommended were to help mother keep G.B. in her home, not help her reunify. Dr. Garett recommended a public health nurse visit her home "to see if, in fact, the environment there is acceptable or manageable," because he was "deeply concerned that as [mother's] son gets older that she may not be capable of coping . . . and act out in a way which will eventually lead to continuous contact with the Department." He also recommended "the Wraparound program or some behavioral therapist should make a home visit and determine whether, in fact, she is handling this child in any way which meets an acceptable way of parenting." These recommendations demonstrate skepticism that mother is capable of caring for G.B. and that at-home services are necessary mostly to confirm whether that skepticism was justified.

Moreover, there was no opportunity to provide the services recommended by Dr. Garett, or for them to be effective, while mother was still receiving family maintenance services. Dr. Garett submitted his report in November 2021. The next month mother was arrested for hitting G.B. It is possible such services might have helped avoid the incident which led to G.B.'s removal. But given how little time passed

between the recommendation and the removal, the juvenile court could reasonably conclude these services either could not have been provided in time or else would not have been helpful.

Mother argues that under *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415 (*Tracy J.*) she was owed further reunification services due to her cognitive issues. We disagree. In *Tracy J.*, the department had used the existence of the parents' developmental disabilities as justification to deny them supervised visitation despite evidence that these disabilities did not endanger the child. The *Tracy J.* parents demonstrated effective parenting when given the opportunity. During supervised visits they "responded appropriately to [the child's] verbal and nonverbal signals, put his needs ahead of their own and consistently displayed empathy toward him." (*Id.* at pp. 1419, 1426.) Despite this, the department refused to allow unsupervised visitation due to inchoate concerns about the parents' disabilities. (*Ibid.*) The court in *Tracy J.* concluded "[w]hen the [department] limits visitation in the absence of evidence showing the parents' behavior has jeopardized or will jeopardize the child's safety, it unreasonably forecloses family reunification on the basis of the parents' labeled diagnoses, and does not constitute reasonable services." (*Id.* at p. 1427.) The court pointed out that the department's concerns "could have been alleviated by scheduling services from [San Diego Regional Center] and the public health nurse and implementing in-home parenting skills training during a portion of the unsupervised visits, and providing initial drop-in checks by the social worker." (*Id.* at p. 1427.) Moreover, the parents "made substantial

11

progress with their court-ordered case plans and demonstrated their abilities to feed, soothe, protect and care for" their child.  (*Ibid.*)  Finally, the department failed to adequately identify, let alone provide services regarding, at least one parent's claimed disability.  (*Id.* at pp. 1428-1429.)

Here, in contrast, there was ample evidence that mother's behavior jeopardized G.B.'s safety such that unsupervised visitation was inappropriate.  Indeed, supervised visitation was required after there was credible evidence of abuse during unsupervised visits.  Even after the department switched to supervised visitation, mother continued to act so erratically that the caregiver requested the department supervise the visits because of a concern about safety.  Moreover, as discussed more below, mother did not make substantial progress in her case plan and did not demonstrate the parenting skills necessary to show she could take care of G.B. in a safe and healthy manner.  Thus, unlike in *Tracy J.*, here there was plenty of evidence that unsupervised visits were inappropriate with or without additional services.

Finally, mother claims Dr. Garett recommended a medication evaluation and behavioral therapy for people with intellectual disabilities through the Inland Regional Service.  We find no such recommendations by Dr. Garett in the record, though the department did refer mother to a medication evaluation in January 2022.

Accordingly, we agree with the juvenile court that the services provided were reasonable given the circumstances.  Certainly, mother faced unique hardships and was due unique consideration in receiving reasonable services, but there is substantial

12

evidence to support the juvenile court's finding by clear and convincing evidence that the services she received were reasonable.

B. *Substantial Probability of Return*

Mother contends that the juvenile court erred in terminating her services and setting a permanency planning hearing because there was a substantial probability of return. We are not persuaded.

At a 12-month review hearing a court must return the child "unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) If the court does not return the child at the 12-month review hearing, "[t]he court shall continue the case only if it finds that there is a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (§ 366.21, subd. (g)(1).) To conclude that there is a substantial probability of return, the court must find (1) consistent visitation, (2) that the parent "has made significant progress in resolving problems that led to the child's removal," and (3) the parent "has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)-(C).)

If the court does not continue the case and the child is a proper subject for adoption, the court must set a hearing under section 366.26. (§ 366.21, subd. (g)(4).)

We review the juvenile court's finding there is no substantial probability of return and decision to terminate reunification services for substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.) The same is true for the juvenile court's finding of detriment. (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864.)

Substantial evidence supports the juvenile court's finding that there was no substantial probability of return. There is evidence that mother has not benefited from the services provided and may be incapable of benefiting from services. Mother did not make any progress addressing the department's concerns with her capacity to parent G.B. On the contrary, mother physically abused G.B., G.B. was removed from her care because of physical abuse, and there is evidence mother physically abused G.B. at least once more during an unsupervised visit. Mother's home and person remained dirty and cluttered throughout the dependency, she continued to struggle with anger management and frustration despite counseling, and she did not appear to have made any progress in overcoming her cognitive and mental health issues to develop greater insight or ability to care for G.B. She remained combative, unstable, forgetful, paranoid, and confused throughout the dependency, lashing out at the department, G.B.'s caregivers, and G.B. himself. Though she completed a substantial portion of her case plan, there was no appreciable change in her behavior.

We make no judgment on mother's character or effort.  Her intellectual disabilities and mental health struggles are not her fault.  Nevertheless, the evidence adequately supports the juvenile court's conclusion that there is no substantial probability of return because mother's disabilities make her incapable of providing G.B. with a safe, healthy home, and services have not helped.

DISPOSITION

We deny the writ petition.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL_____<br>J.

We concur:


CODRINGTON_____
       Acting P. J.


FIELDS_____
       J.